THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
VERSIE LEE OWENS, Defendant-Appellant.

Fourth District   No. 4—86—0341

Opinion filed May 21, 1987.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's
Officer, of Springfield, for appellant.

Jeffrey K. Davison, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Following a jury trial, the defendant, Versie Lee Owens, was convicted of murder. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a).) She appeals, asserting (1) the evidence presented at her trial was, as a matter of law, insufficient to sustain a murder conviction and (2) the testimony of Officer Gary Knight concerning the analysis of blood spatters found at the scene of the killing was improperly admitted, due to lack of a foundation establishing acceptance of that investigative technique in the scientific community and the State's failure to qualify Knight as an expert on blood-spatter analysis. Owens requests we reverse her conviction and remand this cause for a new trial or, alternatively, that we reduce her conviction to voluntary manslaughter pursuant to Supreme Court Rule 615(b) (87 Ill. 2d R. 615(b)).

Owens promptly turned herself in to the police following the fatal shooting of the decedent, Donald "Count" Morton. She admits she killed Morton. The principal issue at trial was whether Morton's actions on the night Owens fatally shot him engendered in Owens either a reasonable or an unreasonable belief that the use of deadly force against Morton was necessary in order to prevent him from inflicting death or great bodily harm on her.

On January 23, 1986, Owens was at Morton's apartment from approximately 1 or 1:10 a.m. until she fatally shot Morton shortly after 6 a.m. Sheldon Clark, a resident of the apartment building in which Morton resided, testified he heard arguing coming from Morton's apartment between approximately 2 and 6 a.m. on that morning, and it was apparent from the words spoken that Morton would not permit Owens to leave. Clark stated that prior to 2 a.m. on the same date, Clark had played cards in Morton's apartment, and Morton expressed displeasure over Owens' coming to the apartment as late as she did. He told Owens she was not going to leave unless she killed him. Although Owens begged Morton to let her out of the apartment door, Morton stood in front of the door and told Owens she was not going anywhere. At one point, Morton asked Clark to get him his knives, which Clark refused to do, and Owens made a move for her purse.

Morton was angry when Clark left his apartment. Clark had seen Morton in the same emotional state about 1 to 1½ months prior to the date in question, when Morton had likewise kept Owens from leaving the apartment. Eventually, however, "they got the act to-

gether" and Morton allowed Owens to leave. On that earlier occasion, Elmer Schultz, the building's resident landlord, was called to Morton's apartment, and Morton threatened Schultz, followed him to his apartment, and stole Schultz' wallet. A couple of weeks prior to Morton's death, he had also threatened Clark and hit Clark over the head with two beer bottles while Clark's back was turned to him. This incident was apparently precipitated by Clark's going to Morton's apartment to recover something which Morton had stolen from Clark's apartment.

After returning to his apartment on the morning of January 23, Clark heard Morton say to Owens, "I will kill you," and also heard him say he was going to kill Owens, "[i]f you go in your purse." Clark did not see a knife or any other weapon in Morton's hand before he left Morton's apartment on the morning of Morton's death.

Lieutenant Gerald Hunk of the Decatur police department stated that soon after Owens turned herself in, he observed a "slight reddening area" on the inside of her upper lip. However, there was no swelling or fresh or dried blood present, and Hunk did not notice that Owens was injured in any other way.

Sergeant John Mickler, also of the Decatur police department, discovered three pieces of broken brown glass on the floor of the kitchen area of Morton's apartment. He also observed a kitchen knife on a bed in a bedroom of the apartment. He did not see any blood in the bedroom. Decatur police Detective George Lebo testified he saw blood in the area beneath Morton's head and also observed some tissue or blood on a milk carton which was in close proximity to Morton's body.

Dr. Grant C. Johnson, a pathologist, stated no powder burns were found on Morton's head, and in order for powder burns not to be caused by a gun such as used by Owens to kill Morton, the gun must be held 29 to 31 inches from the victim's head. The bullet entered Morton's head from an upward 45-degree angle, but this does not in itself explain the position of the individuals at the time the fatal shot was fired.

On cross-examination, Johnson stated that, with absolute certainty, he could say the gun was fired at least 10 inches away from Morton's head and "with all probability" was fired 30 inches from his head. On redirect examination, Johnson stated the relationship of the gun muzzle to Morton's head, "could imply a number of different positions of the decedent as well as the gun including sitting." It is necessary to bear in mind "the head is highly mobile. It can go from side to side, and it can go way back."

Gary Knight stated he has been employed with the Illinois State

Police for 17½ years and has been a crime scene technician for approximately 7 years. It is the responsibility of a crime scene technician to "process crime scenes for the physical evidence, do all the photography, the sketching, fingerprinting, collection of the evidence, the proper packaging and receipting of that evidence, the crime scene sketching, [and] relaying the evidence to the crime lab for analysis." In his occupation, Knight has done crime scene investigations for various police departments, including the Decatur police department.

After describing the appearance of the room where Morton's body was discovered and the evidence which he gathered there, Knight stated he attempted a reconstruction of the scene of Morton's death. He further testified that crime scene reconstruction is a common practice for crime scene technicians. Knight has reconstructed homicide scenes on probably several hundred occasions.

When asked what factors he considered in attempting to reconstruct the scene of Morton's death, Knight stated one factor was the size of the room. Although firearms experts and pathologists are primarily responsible for range determination, the size of the room where the shooting occurred limits the possible range from which a shot is fired. Given the size of the room in which Morton was killed, the fatal bullet could not have been fired from a distance of more than 10 to 12 feet.

Knight further testified, over the objection of Owens' counsel:

"The most important aspect that might be involved in this particular case would be blood spatters interpretation. We do know with the proper amount of training and the proper examination of blood spatter that may be recovered or preserved through photographs and measurements within a scene that blood—the flight of blood characteristics have interesting patterns. If, in fact, we have a pass through—that is, a bullet passes through a victim—the bullet will do certain things. We have high velocity blood spatter interpretation, low blood spatter interpretation. High velocity, low velocity, medium velocity blood spatter interpretation, it's the flight of the blood. In this particular instance, there was something interesting here. We have the milk carton ***.

* * *

The location of the milk carton in relationship to the body, first of all, is firmly planted against the victim's buttocks and legs. Secondly, the location of the blood and tissue matter is on top of the milk carton—is it milk carton or milk case, I should say; ***."

In response to a question as to what other factors he took into account in his reconstruction of the scene of Morton's death, Knight stated, also over defense counsel's objection:

"High velocity is generally caused by propelling of the blood by the bullet from a firearm. They would generally be very fine spattering—very fine spattering. Now, that is only if you have a pass through. That is, the bullet passes through the body, contracts and opens up the blood; and causes that spatter outward that gives us directionality. Another thing happens, it's what's called casts offs. They come back from that projectile. They will have tails on them. They're rounded on the end and have tails. From that, we get directionality. If I can find that, the tails, I can go back to the source from which the blood came.

\* \* \*

In this instance, the milk carton contained cast offs as well as the tissue. That source then with directionality from it came from the frontal area in my opinion."

Finally, when he was asked if he was able to determine, to a reasonable degree of expertise as a crime scene technician, the location of Morton when he was shot, Knight said:

"Based upon the location of the blood spatters on the milk carton, it would be my opinion that the body had to be in one of two positions at the time he received the bullet, either standing directly behind the milk carton or sitting on it. Common sense in examining that scene would indicate to me that the victim was sitting upon that at the time he received it."

Owens' counsel objected to admission of this conclusion on the basis that it lacked a proper foundation because there was no testimony Knight had any scientific training in this area or that the blood-spatter investigative technique has gained acceptance in the scientific community. On cross-examination, Knight stated that he studied "blood spatter technique" under Professor McDonald. He admitted that if Morton had been seated on the milk carton when shot, "tissue and blood would either have come outward from an implosion or fallen directly down in front of him." Knight further acknowledged that if Morton "was standing in front of the milk carton and was facing the shooter, and the milk carton was between him—or a couple of feet in front of him, the implosion would have caused the material to have fallen and land on the carton." Knight admitted that the sequence of events "could have very well happened that way."

Knight's conclusion Morton was sitting when shot was a calcu-

lated guess on his part "as to two possible things that could happen, either of which are equally likely." Finally, Knight admitted he prepared no report regarding his theories concerning the milk carton *vis-a-vis* Morton's position when shot.

Several defense witnesses described prior incidents involving threats and unlawful restraint on the part of Morton. Roger Sexton, a Decatur police officer, testified that on January 30, 1984, Morton retrieved some of his clothing from Owens' residence. At that time, Morton became very irate and stated he was going to kill Owens. Morton also cursed police officers who had been summoned to the scene, including Sexton, and he was therefore arrested on a charge of disorderly conduct. Decatur police officer Edgar Combs, who accompanied Officer Sexton to the scene of the January 30, 1984, altercation, testified Morton told him that Owens waved a gun from inside the house through the window, but no weapon was found.

Cheryl Hicks testified that in the fall of 1985, Morton and Owens played cards at Hicks' home. Morton grabbed and pushed Owens in an effort to compel her to leave when he wanted to leave. Thereafter, Morton went outside Hicks' residence and ran at her every time she would try to leave. This occurred about three or four times, and the police had to be called so Owens could leave Hicks' residence.

Emma Evans similarly stated that on many occasions when Owens and Morton visited Evans' residence, Morton would try to prevent Owens from leaving by grabbing her arm and pulling her back. On more than one occasion, Morton stated he would "kick [Owens'] ass" if she left.

Jesse L. Grandberry testified that in August or September 1985, Morton told Owens he would kill her if he ever caught her seeing another man.

Elmer Schultz, the resident landlord of the building where Morton lived, stated that approximately one to two weeks before Morton's death, he approached Morton's apartment after he heard arguing in the apartment and saw Morton standing in the doorway of the kitchen of the apartment. Thereafter, Owens left Morton's apartment and Morton followed Schultz to his apartment. While at Schultz' apartment, Morton twice threatened to "beat [Schultz'] ass," pushed a file box onto the floor, and removed money from Schultz' billfold.

Steven Kasarsky, a Department of Law Enforcement forensic scientist assigned to latent print identifications, stated that a latent print of one of Morton's palms was discovered on the inside of the neck of a broken beer bottle found in Morton's apartment after his death. The print was obviously placed on that portion of the bottle af-

ter it had been broken. On cross-examination, Kasarsky stated the presence of a print in this location was merely consistent with someone picking up the bottle fragment, and it was not indicative of what happened after the fragment had been picked up.

Testifying on her own behalf, Owens recounted arriving at Morton's apartment on January 23, 1986, where she, Morton, Clark, and William Johnson played cards. All four argued after Johnson and Morton allegedly began cheating, but eventually just Owens and Johnson were arguing. Schultz then came to the apartment and told the occupants to quiet down. After Schultz left, Owens started to leave. Morton thereupon got in front of the door, told Owens she was not going anywhere, grabbed her by her arm, and threw her into the bedroom of the apartment. He held her up against the wall and called to Clark and Johnson to bring him the knife which was under the bed. Neither Clark nor Johnson complied with this request. While in the bedroom, Morton started for Owens' purse in order to get the gun which Owens carried in the purse for her protection.

After Owens and Morton went outside the bedroom, Owens again started toward the door and Morton again got in front of the door and told her she was not going anywhere. Owens then sat down and Morton hit her in the chest with both palms of his hands. Subsequently, he hit Owens in the chest a second time and slapped her in the face with his open hand. At that time, Clark and Johnson left the apartment and Morton again prevented Owens from leaving, stating, "If you say you don't love me anymore, I'll kill you. If you say you don't go with me anymore, I'll kill you. If you say you're not coming over here tomorrow, I'll kill you." Owens again sat down, and Morton inquired whether her heart was hurting. Owens replied in the affirmative, and Morton said, "Good. I hope you die. I hope you fall in [sic] the floor and die."

When Morton once more prevented Owens from leaving, Owens scuffled with Morton, got the door open, and called to Schultz for help. Morton then hit Owens in the jaw. During the early morning hours of January 23, 1986, Owens went to the door "maybe about 8, maybe 12" times. On one occasion, Owens went to the door while Morton started to the bedroom. Morton got a knife out of the bedroom, told Owens she was not going anywhere, and reached in the garbage can and grabbed a beer bottle. He said that he did not need the knife, put it down, broke the beer bottle, and put it to Owens' neck. He put the beer bottle down, however, after Owens said, "Please don't do it, Count." Morton then threw the knife on the bed. Owens testified that at this time she was scared and shaking and

knew Morton was going to kill her.

Morton subsequently stated he knew that Owens was tired and sleepy and that she could lie down on his bed. Owens refused this invitation and again sat down on a chair. Morton lay down on the floor in front of Owens. After a lengthy period of time, Morton again prevented Owens from leaving the apartment and stated, "[I] said maybe 6 or 7 o'clock before I let you leave, say you won't leave. I won't let you leave all day. I may just keep you here all day." Morton also told Owens he would cut the tires on her car and bust out the window.

Toward the end of the early morning hours, there were people walking up and down the stairs outside Morton's apartment, and Morton occasionally opened the door and spoke with some of them. While Morton opened the door to visit with some of these individuals, Owens was able to get the gun out of her purse. Morton then started walking rapidly toward her, "[j]ust like a madman with eyes just glazing and stuff like that." One of Morton's hands was behind him. Owens knew that Morton was going to kill her when she saw him approaching her in this manner. Owens testified she shot Morton and left the apartment.

On cross-examination, Owens stated that although she knew George Grandberry, one of the persons with whom Morton conversed at the entrance of his apartment before she shot him, she did not yell to Grandberry or anyone else for help because she was frightened and scared. She further stated Morton told her if she got the gun out of her purse, he would shoot her with her own gun. When asked whether she could have yelled to Jimmie Thomas, whose apartment was located across the hall from Morton's and who was admittedly in his apartment when she shot Morton, Owens simply stated, "It's a time when he had the knife and the bottle I was yelling." Owens admitted she did not see the knife in Morton's hand after he threw it in the bedroom, but stated Morton entered the bedroom twice after he threw the knife in there, and she knew he entered the bedroom to get the knife. Although she never saw Morton carrying anything when he left the bedroom, Morton always kept his knife under his shirt.

Owens further stated that when Morton approached her before she shot him, he "was looking real crazy and wild, *** with his eyes coming out of his head," and she had never before seen him in such a rage. Owens did not point the gun at Morton's head and did not know where she shot him. Morton "fell like a rock" after Owens shot him in the kitchen of the apartment, and Owens kicked a milk carton out of the way so that she could leave the apartment. Owens further testified that during the early morning hours of January 23, 1986, she

scuffled with Morton, and he grabbed her gun while apparently attempting to remove some money from her purse. However, Morton was apparently unsuccessful in gaining possession of the gun.

On redirect examination, Owens testified that Morton held her hostage two to three weeks prior to the date on which she shot him. At that time, Schultz came to Morton's apartment and helped Owens to leave.

■■ ■ We first consider Owens' contention that Officer Knight's testimony concerning blood-spatter analysis was improperly admitted. The trial court apparently mistakenly believed determination of the qualifications of experts is a question of fact for the jury. For instance, in addressing the portion of Owens' post-trial motion directed to Officer Knight's blood-spatter analysis testimony, the court stated:

"I think experts range from minor to major as far as qualification, ability, and their opinions; and it's a matter for the jury to judge their ability, their reasonableness, their foundation as a part of the questions of fact."

The admissibility of all evidence, including the testimony of expert witnesses, is a matter for determination by the trial judge, not the jury. M. Graham, Cleary & Graham's Handbook of Illinois Evidence sec. 104.1, at 29-30 (4th ed. 1984).

Where Illinois courts have not previously taken judicial notice of the reliability of a specific type of scientific evidence, the State must establish it is based on a well-recognized scientific principle or technique which has gained general acceptance in the particular field in which it belongs. (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070; *People v. Knox* (1984), 121 Ill. App. 3d 579, 459 N.E.2d 1077.) In order to testify as an expert, one must possess experience and qualifications which afford him or her knowledge which is not common to lay persons and which will assist the trier of fact in reaching its conclusions. (*People v. Jordon* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) The burden of establishing an expert's qualifications is on the proponent of the expert's testimony. *People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.

■ We find no cases in which Illinois courts have taken judicial notice of the reliability of blood-spatter analysis evidence. The State should have produced evidence to demonstrate the reliability of the spatter characteristics of human blood in determining the position of a decedent when shot. The State presented no evidence as to the source of Officer Knight's training, the techniques he had learned, or their applications in the field. There was no evidence of any tests relied on by Officer Knight in support of his conclusions that certain

types of bullet impacts produce particular spatter patterns. The evidence regarding the scientific reliability of Knight's blood-spatter testimony fell far short of that presented in *Knox*, the sole Illinois case in which evidence of blood-spatter analysis has been held admissible. Therefore, the circuit court erred in failing to sustain Owens' objections to admission of the blood-spatter testimony and Officer Knight's conclusion as to Morton's position when shot, which was based thereon.

In addition, Officer Knight's blood-spatter testimony was improperly admitted because the State did not establish Knight's qualifications as a blood-spatter analyst. The State did not produce any evidence of Officer Knight's training or experience in the field of blood-spatter analysis. Although Knight did testify on cross-examination that he had studied "blood spatter technique" under Professor McDonald, this testimony is not sufficient in view of the State's burden of establishing Officer Knight's qualifications. (*People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.) The trial court abused its discretion by permitting Knight to testify on this subject.

■ The admission of Officer Knight's testimony was not harmless error. The evidence in this case was closely balanced, with the principal points of contention being Owens' credibility as a witness and Morton's position when shot by Owens. Knight's conclusion that Morton was seated when Owens shot him could have been the key factor in the jury's decision to find Owens guilty of murder.

■ We next consider whether all of the evidence presented at Owens' trial, including Officer Knight's testimony, is inadequate to sustain a murder conviction. In this case, the crucial inquiry in determining whether Owens committed murder or voluntary manslaughter is whether she held an unreasonable belief that the use against Morton of force intended or likely to cause death or great bodily harm was necessary in order to prevent death or great bodily harm to her. If Owens so believed, she committed voluntary manslaughter; if she did not hold such a belief, she committed murder. (Ill. Rev. Stat. 1985, ch. 38, pars. 7—1, 9—1(a), 9—2.) A reasonable belief on the part of Owens that force intended or likely to cause death or great bodily harm was necessary to prevent Morton from inflicting death or great bodily harm on her would be a complete defense to both murder and voluntary manslaughter charges. Ill. Rev. Stat. 1985, ch. 38, par 7—1.

In this case, the record contains substantial evidence upon which a trier of fact could conclude that when Owens killed Morton, she either reasonably or unreasonably believed the use of deadly force was necessary to prevent death or great bodily harm to her. However, as-

suming an adequate foundation for Officer Knight's blood-spatter testimony, an equally reasonable conclusion is that Morton was seated when Owens shot him and Owens therefore did not believe deadly force was necessary in order to prevent the infliction of death or great bodily harm on her at that time. None of the cases cited by Owens on the insufficiency of the evidence to support a murder conviction require that conclusion here, for in none of those cases was there evidence the decedent, when killed, was in a position in which he or she posed no immediate danger to the defendant.

We hold (1) Officer Knight's testimony concerning blood-spatter analysis and Owens' position when shot was improperly admitted because of an inadequate foundation, and (2) if the above testimony had been supported by an adequate foundation, the State's evidence would not have been insufficient, as a matter of law, to support a murder conviction. We therefore reverse Owens' conviction and remand to the circuit court for a new trial.

Reversed and remanded.

McCULLOUGH and LUND, JJ., concur.