THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EARLY LEE SMITH, Defendant-Appellant.

Fourth District    No. 4—93—0039

Opinion filed April 13, 1994.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial in the circuit court of Macon County, defendant was found guilty of aggravated battery with a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2) and obstruction of justice (Ill.

Rev. Stat. 1991, ch. 38, par. 31—4(a)) and sentenced to consecutive terms of 12 and 2 years' imprisonment, respectively. Defendant appeals the conviction for aggravated battery with a firearm, claiming the trial court erred in (1) refusing to instruct the jury on a charge of reckless conduct; and (2) admitting evidence regarding blood-spatter analysis where the witness was not qualified as an expert in the field. We reverse and remand.

On March 5, 1992, defendant was in a car with two friends, Mario Manns and the victim, Ed Vorties. Vorties was driving, Manns was in the backseat, and defendant sat in the passenger seat. After a short argument, Vorties agreed to let defendant drive the car. He got out of the car, walked around it, and stood by the open passenger-side door. According to Manns, defendant emerged from the car holding a handgun and pointing it at Vorties, apparently in a playful manner. Manns described the events as follows:

"Early had the gun and Edward Vorties was—he was pointing the gun at Edward Vorties and Ed was like 'Quit playing.' It looked like it was going to start raining and he was still playing with the gun. Early Smith was still playing with the gun. And Edward Vorties was getting into the car and[,] while he was sitting down[,] Early Smith was still playing with the gun and all of a sudden the gun went off and he fell inside of the car."

Defendant then drove the car to the home of Darnell Winfrey. On the way, defendant allegedly stated words to the effect that Vorties was his best friend and that shooting him had been an accident. Manns told him they should drive to a hospital, but defendant refused because he had warrants out for his arrest. Defendant instructed Manns to tell anyone who asked that it was an accident. He later instructed Manns to say Vorties had shot himself.

At Winfrey's house, defendant wiped off the handgun and gave it to someone standing by the car. Manns stayed at the house while defendant and Winfrey drove to the hospital. When police interviewed Manns, he gave them a number of different false accounts of the incident. Later he explained this, saying he was nervous and scared at the time. In one of these accounts, he claimed to have been asleep in the backseat of the car at the time of the shooting. In another account, he told police that Vorties had shot himself. Defendant also gave a number of conflicting accounts when interviewed by police. In each account, however, he stated that Vorties shot himself. Defendant did not testify at trial, but his counsel maintained in closing arguments that Vorties had shot himself.

At the jury instruction conference, defense counsel argued that Mann's testimony provided sufficient evidence for a rational jury to

find defendant guilty of reckless conduct (Ill. Rev. Stat. 1991, ch. 38, par. 12—5), a Class A misdemeanor. The trial court disagreed, finding there may have been evidence of recklessness prior to the act of shooting, when defendant was waving the gun around. However, in the shooting itself, there was no evidence that could support the instruction.

The offense of reckless conduct is defined as follows:

> "A person who causes bodily harm to or endangers the bodily safety of an individual by any means, commits reckless conduct if he performs recklessly the acts which cause the harm or endanger safety, whether they otherwise are lawful or unlawful." Ill. Rev. Stat. 1991, ch. 38, par. 12—5(a).

The mental state of recklessness is defined as a person who:

> "[C]onsciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1991, ch. 38, par. 4—6.

■ Our court has held that the offense of reckless conduct may be an included offense of aggravated battery, the only difference being the degree of culpability. (*People v. Thomas* (1971), 1 Ill. App. 3d 139, 143, 275 N.E.2d 253, 255.) Where there is evidence in the record which, if believed by the jury, would reduce the crime to an included offense, an instruction defining the lesser offense should be given. This rule applies, even where the theory of defense at trial is inconsistent with the possibility that defendant is guilty of the lesser charge. *People v. Perry* (1974), 19 Ill. App. 3d 254, 257-58, 311 N.E.2d 341, 344.

In *Perry*, the court recognized that handling a gun improperly may be reckless conduct. The defendant in that case armed himself and went looking for Melecio, the person who had hit his brother. When Melecio saw the defendant approaching, he threw a bottle toward him. The defendant testified that as he put up his shoulder to shield himself from the bottle, the gun came out of the waistband of his pants and fired, hitting a bystander. Despite conflicting evidence, the appellate court found defendant's trial testimony was sufficient to create an issue of fact as to whether he acted intentionally or recklessly.

The State argues that Mann never explained what he meant when he said defendant was playing with the gun. Accordingly, his testimony is too vague to establish recklessness. Citing *People v. Smith* (1980), 90 Ill. App. 3d 83, 412 N.E.2d 1102, the State argues

that generalities of conduct may not be used as the basis for a jury instruction that would permit a conviction for reckless conduct. Evidence of specific acts indicating recklessness must be heard before the jury may be instructed in this offense. Furthermore, the fact that the gun was only two or three inches from the victim's head when it . fired indicates defendant intended to fire the gun.

We disagree. We find Manns' testimony sufficient to create an issue of fact as to the mental state of the defendant. The trial court's observation that defendant was playing with the gun up to the time it went off, whereupon he suddenly manifested "intent," is entirely without basis in the evidence. Vorties was defendant's friend. No discernible motive was offered for his alleged murder, and the only witness to the shooting portrayed the incident as accidental in nature. Whether Manns' testimony is believable in light of the lies he told police is a determination for the trier of fact. The trial court erred in failing to instruct the jury on the offense of reckless conduct. Therefore, we must reverse and remand for a new trial.

Next, defendant contends the trial court erred in admitting expert testimony on blood-spatter evidence because the witness was not qualified as an expert in this field. The State's theory of the case was that defendant had shot Vorties while outside the car. Defendant, on the other hand, maintained that Vorties shot himself while he was in the car. In support of its theory, the State presented testimony of Detective Lebo, a crime-scene processor for the Decatur police department.

Lebo testified he had been a detective for 25 years, working in crime-scene processing for the last 19 or 20 years. He attended two schools at the police training institute which were specifically directed toward crime-scene processing. Each school session lasted two weeks. In addition, he attended other one-week schools involving particular techniques of crime-scene processing and has worked closely with State of Illinois crime-scene technicians throughout his career. As part of his training, he received instruction on the flight characteristics of bloodstains and blood-pattern interpretations.

Lebo was in charge of crime-scene processing for the shooting in this case and personally examined the car where it took place. He repeated the fact that part of his training and experience involved examining blood markings. He was then asked to explain the terms "low[-]velocity" and "high[-]velocity" blood markings. He stated that low-velocity markings would be found where blood drips off the wound and forms a relatively smooth circle; high velocity refers to liquid which has been accelerated. When it strikes a surface there is a high impact, causing it to explode and creating very fine blood marks or streaks of blood on the surface which is struck.

Lebo found no blood markings on the exterior of the car. He was then asked what kind of blood markings he would expect to find if a person was shot inside a car. He replied that in a case such as this involving a "through and through" wound, he would expect both high- and low-velocity blood spatters: high velocity from the exit wound, and low velocity from the wound itself. When asked what he would expect to find if the person had been shot outside the vehicle and then fell into the car, he replied he would expect only low-velocity markings inside the vehicle. The State then asked whether he found high-velocity markings in the car. Defense counsel objected, stating that Lebo lacked the qualifications to testify to this matter. The objection was overruled, and Lebo replied that no high-velocity markings were found—only low-velocity markings. Later, defense counsel again objected when Lebo was asked whether he would expect to find a bullet hole if someone had been shot inside the car. The objection was overruled, and Lebo stated that in this case (where the individual was shot from the right side) you would expect the bullet to strike somewhere on the driver's side.

On appeal, defendant contends Lebo recited only general police training and background as a crime-scene technician. He cites *People v. Owens* (1987), 155 Ill. App. 3d 990, 508 N.E.2d 1088, where our court reversed a murder conviction on grounds that the blood-spatter analysis was improperly admitted into evidence. We found that the State in that case should have provided evidence to demonstrate the reliability of blood-spatter characteristics in determining the position of a decedent when shot. Furthermore, the State presented no evidence as to the source of the witness' training, the techniques he had learned, or their application in the field. Accordingly, the State failed to meet its burden of establishing the officer's qualifications to testify in this matter. Moreover, no evidence was presented of any tests done to support the witness' conclusions that certain types of bullet impacts produce particular spatter patterns.

The *Owens* decision is based upon the rule that where Illinois courts have not previously taken judicial notice of the reliability of a specific type of scientific evidence, the State must establish it is based upon a well-recognized scientific principle or technique which has gained general acceptance in the particular field in which it belongs. (*Owens*, 155 Ill. App. 3d at 998, 508 N.E.2d at 1094.) The *Owens* court found that evidence regarding the scientific reliability of the blood-spatter analysis testimony fell far short of that presented in *People v. Knox* (1984), 121 Ill. App. 3d 579, 459 N.E.2d 1077, the sole Illinois case to date in which blood-spatter analysis had been held admissible.

In *Knox*, the witness offering evidence of blood-flight analysis

testified that he attended a school in blood-flight analysis in New York and a workshop with the St. Louis medical examiner's office. The witness had conducted experiments with human blood designed to reproduce various bloodstains or splashes he had observed at crime scenes. A divided *Knox* court held that his evidence at trial was not of such a complex nature as to require a more detailed scientific foundation than what he had provided. The officer testified as to the source of his training, the techniques he had learned, and their applications in the field. Accordingly, the trial court was provided sufficient information to enable it to make an informed decision regarding the reliability of the evidence.

■ In the case at hand, the State contends defendant has waived this issue on appeal because he failed to object to all the evidence at trial and did not raise the issue in his post-trial motion. Failure to raise a point in post-trial motion acts as a waiver of the issue on appeal. (*People v. Berry* (1984), 99 Ill. 2d 499, 503, 460 N.E.2d 742, 744.) Since the issue may well arise again in defendant's new trial, we shall address the merits of defendant's argument.

The admissibility of expert testimony and the adequacy of his qualifications are matters left to the sound discretion of the trial court. (*Knox*, 121 Ill. App. 3d at 583, 459 N.E.2d at 1080.) The indicia of expertise is not a given level of academic qualification, but whether the expert has knowledge and experience beyond that of the average citizen which would assist the jury in evaluating the evidence. *People v. Pollard* (1992), 225 Ill. App. 3d 970, 976, 589 N.E.2d 175, 179.

At the outset, we note that the theoretical reach of Lebo's testimony was quite limited. It merely established that blood dripping from an open wound leaves a mark noticeably different from that of blood which has been accelerated by a bullet passing through a body. He then stated that blood markings found inside the car appeared only to be caused by the above-mentioned dripping blood, not accelerated blood. He also stated that if a person is shot inside a vehicle, he would expect to find a bullet hole inside the vehicle. Detective Lebo's analysis does not stretch the theoretical boundaries of science.

In contrast to Lebo's testimony, the expert testifying in *Owens* attempted a full reconstruction of the scene of a homicide. Through this theoretical reconstruction he was able to determine the direction of the gunshot, the location of the body, and the fact that the victim was sitting up at the time he was shot. The conclusion that the victim was seated was thought to be a key factor in the jury's decision to convict the defendant. In the present case, Lebo made no attempt to reconstruct the shooting, nor did he even express an opinion as to

where Vorties was shot. He merely described characteristics of blood markings found in the car and categorized them as either high- or low-velocity markings. We find Lebo, or any other crime-scene technician with even a modicum of experience in processing crime scenes involving gunshot wounds, to be fully qualified to offer such limited testimony. We find no abuse of the trial court's discretion in admitting Detective Lebo's testimony.

Reversed and remanded.

COOK and GREEN, JJ., concur.