THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAMONT JACKSON, Defendant-Appellant.

First District (1st Division)   No. 1—99—2725

Opinion filed March 30, 2001.

Michael J. Pelletier and Yasemin Eken, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Michelle Katz, and Anne L. Austin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COHEN delivered the opinion of the court:

The defendant, Lamont Jackson, and his codefendant, Jessie Williford, were indicted for first degree murder, attempted armed robbery and other offenses. Williford received a sentence of 25 years' incarceration pursuant to a plea bargain. Jackson pled not guilty and opted for a bench trial. The judge convicted Jackson and sentenced him to 50 years in prison.

Jackson appeals his conviction, arguing that the trial court improperly considered polygraph evidence that buttressed a confession made by Williford implicating Jackson.

Jackson also appeals his sentence, arguing that: (1) the trial court based its sentence in part on improperly admitted evidence that Jackson was the shooter from an officer who had not been qualified as an expert in ballistics; (2) the trial court improperly considered more than one victim impact statement from the family members of the murder victim; and (3) the court abused its discretion in refusing to allow the defendant a continuance to present mitigation witnesses.

We affirm.

## BACKGROUND

After the defendant was arrested, he gave a court-reported statement before an assistant State's Attorney (ASA). In the statement, the defendant related the following events.

On the morning of July 13, 1996, Jessie Williford, whom the defendant had known since he was 12, came to see the defendant. The defendant got dressed in black shorts and a black and white shirt. The two then went to Williford's godfather's house and stayed there between 30 and 40 minutes. They then drove to a mall, where the defendant bought some car supplies at Trak Auto. As they left the store, Williford said he wanted to go to "the Arab store with the high priced clothes" to "check things out." The defendant was familiar with the store to which Williford was referring, a store called "Tops and Bottoms." He knew that Williford wanted to rob the store. When they were in the car Williford pulled up his shirt and showed the defendant a black semiautomatic handgun in his waistband.

They decided that the defendant would go into the store first in order to see if there were police officers, a large number of people or a

security camera inside. Then Williford would come in and rob the store with his handgun. After Williford had taken the money out of the register, he would run for his grandmother's house while the defendant would drive away.

Williford and the defendant parked the car and the defendant walked into the store as planned. Williford, however, came in right behind him instead of waiting. The defendant walked to the west side of the store. Williford was on the east side. The defendant saw a man standing near a glass counter. He thought that the man made a motion as if to draw a weapon, although the defendant did not actually see a gun in his hand. Then he saw Williford draw his semiautomatic. He heard gunshots and then ducked. He thought he heard two guns firing. In the ensuing chaos, the defendant slipped out of the store and drove to his sister's house. The defendant did not see Williford again until August 4, 1996, when Williford told him that the police were looking for them in connection with a murder.

Williford also gave a statement that was read at trial. Williford stated that on the morning of July 13, 1996, he was at his uncle's house when the defendant came over. They got into the defendant's car, and the defendant showed Williford a black semiautomatic handgun in his waistband. Williford suggested they commit a robbery and the defendant agreed.

They then drove to Trak Auto and bought a quart of oil. As they drove, they worked out a plan for the robbery. They would stick up the store called Tops and Bottoms. The defendant would draw his handgun and yell "stickup" and Williford would take the money from the register.

They parked, entered and walked around "casing" the store. The defendant stared at a man near the back of the store and said "There go the nigger." The defendant drew his weapon, and Williford ducked down. Williford heard five to eight shots from the defendant's direction. He did not see anybody else with a gun. After the shooting stopped, Williford ran out of the store and went to his grandmother's house.

Mohamed Kassim, the owner of Tops and Bottoms, testified that on July 13, 1996, he was working at the store with three or four employees. He was bagging clothes for a customer when the customer said he needed to get more money from his car and left. The customer then came back in and walked towards the back of the store, where he had a conversation with a man in the west aisle of the store wearing a white T-shirt. Kassim noticed that the man in the white T-shirt had a handgun. Kassim heard gunfire and he ducked down behind the counter. He could hear people running out of the store. He peeked out

from behind the counter and saw the man in the white T-shirt walk out of the store while putting the handgun in his waistband. Kassim was told that a woman had been shot, and he called 911. The woman, later identified as Karen Heard, died of multiple gunshot wounds to the back and arm.

Melvin Evans, an employee at Tops and Bottoms, testified that at about 11 a.m. on July 13, 1996, he was at the store trying to fix the vacuum cleaner. As he knelt over the vacuum cleaner he heard some yelling from the back of the store. Evans turned and saw an African-American man wearing black shorts and a white T-shirt. The man was holding a gun. Evans turned back around. He heard a gunshot and dropped to the floor beneath a clothing rack. He did not see the face of the man in the white T-shirt and did not see him firing.

Detective Richard Chernikovich testified that on July 13, 1996, he was assigned to investigate a homicide at Tops and Bottoms. When he and his partner, Detective Joe Walsh, arrived at the store, they observed the body of Karen Heard on the floor. They recovered evidence including expended casings, a spent bullet, and blood splattered on and behind the glass counter. There was a hole where a bullet had gone through one of the display shelves. There were two bullet holes in the east wall of the store.

At trial, Detective Chernikovich testified that from the position of bullet holes in the east wall and the bullet hole in the shelf one could determine that the shooter must have been on the west side of the store. Detective Chernikovich explained his conclusions referring to pictures of the crime scene introduced by the State.

About a week after being assigned to the case, Detective Chernikovich received a call from a confidential informant. After meeting with the informant, he and Detective Walsh went looking for a man nicknamed "Pig" and his cousin. The detectives eventually learned that "Pig" was Jessie Williford and his "play cousin" was someone named Lamont. Williford was arrested on August 4, 1996. The detectives learned from him that the name of his "play cousin" was Lamont Jackson. The defendant was arrested on August 6, 1996.

Detectives Chernikovich and Walsh questioned the defendant at the station. At first the defendant denied any knowledge of the crime. He said he had been at the park that day with his brother and his brother's children, who were visiting from Minnesota. He would not provide his brother's name and did not have an address or phone number. Later the defendant admitted that Williford had told him that the police were looking for them in connection with the shooting.

After being told about Williford's initial oral confession to the police, the defendant admitted that he had gone to Tops and Bottoms

with Williford. However, he said he merely went in, noted the prices were too high, and then went outside again and waited for Williford. He said he did not hear gunshots.

Later, the police confronted the defendant with Williford's court-reported confession. After reading the statement silently, the defendant said "That dumb mother fucker, I am going to kill him." He then said he would tell the detectives the truth about what happened at the store. He admitted participating in the robbery but said that he was not the shooter. The next morning the defendant gave his court-reported statement in the presence of Detective Chernikovich and an ASA. Detective Chernikovich drew diagrams of the store on which the defendant indicated where he, Williford and the other man that he had thought might have a gun were located. The defendant placed himself in the west side of the store and Williford on the east side.

Williford testified at the defendant's trial and, though he was called by the State, he denied that his statement implicating the defendant was true. He denied that either he or the defendant was at Tops and Bottoms on July 13, 1996, or that they ever planned to rob the store.

Williford testified that he was arrested on August 4, 1996. Williford said that, when questioned, he denied being involved in the murder, but could not recall whether he had denied being at Tops and Bottoms that day. The State elicited that Detective Walsh asked him to take a polygraph examination and Williford agreed to do so. After being told that he had failed the polygraph exam, Williford admitted that he and the defendant had robbed the store. He told the police that the defendant was the one who had the gun and Williford's job was to take the cash from the register. However, he said, while they were casing the store a man made some sort of statement to the defendant, who then drew his weapon and started shooting. A few hours after his oral confession Williford gave his court-reported statement.

On cross-examination, Williford testified that at the time he gave his statement he was a heroin addict and was suffering severe withdrawal. Williford further stated that the police told him that if he gave a statement against the defendant he would not be charged with first degree murder and could go home. He gave the statement in order to get out and get more heroin.

Detective Chernikovich was recalled to the stand and testified that Williford changed his story and confessed right after he was told that he had failed the polygraph exam.

The judge found the defendant guilty. The sentencing hearing was scheduled for June 8, 1999, a few weeks after the trial. On June 8, the court granted the defendant a continuance until June 11 over the

State's objection. On June 11, the defendant requested another continuance, since family members of the defendant who were supposed to testify in mitigation were not available that day. The court denied the motion.

At the sentencing hearing, the court considered multiple victim impact statements from the family of Karen Heard. Based in part on the conclusion that the defendant had been the shooter, the court sentenced him to 50 years in prison.

The defendant now appeals his conviction and sentence. He argues that his conviction must be reversed because the trial court erroneously admitted polygraph evidence. He argues that his sentence must be vacated because the court denied his request for a continuance, because the court based the sentence in part on improperly admitted ballistics evidence suggesting that the defendant was the shooter and because the court considered more than one victim impact statement from Karen Heard's family, which, he claims, violated the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq.* (West 1996)).

## ANALYSIS

### I. Polygraph Evidence

The defendant first contends that the trial court committed reversible error in admitting evidence regarding the polygraph examination taken by Williford. The polygraph evidence suggested that Williford's initial story to the police, to which he reverted in his trial testimony, was false and that his court-reported confession implicating the defendant was true.

■ There is a firmly established rule in Illinois against the introduction of evidence relating to polygraph examinations. *People v. Lewis*, 269 Ill. App. 3d 523, 527, 646 N.E.2d 305, 308 (1995). Such evidence does not have sufficient reliability for admission, but if it is admitted, as the Illinois Supreme Court has observed, it is likely to be taken not merely as reliable but as *completely determinative* of guilt or innocence. *People v. Gard*, 158 Ill. 2d 191, 201, 632 N.E.2d 1026, 1031 (1994). However, our supreme court has held that polygraph evidence is admissible in one limited circumstance. It may be used to rebut a claim that an incriminating statement was improperly obtained. *People v. Jefferson*, 184 Ill. 2d 486, 496, 705 N.E.2d 56, 61 (1998).

■ Here, however, when the court admitted the polygraph evidence, Williford had not yet made any charge of coercion. The prosecutor indicated that he was offering the polygraph evidence to show "the course of conduct that led to [Williford's] court reported statement." It was error to admit such evidence at that point in the trial. The mere fact that a witness is testifying in a manner inconsistent with a

prior statement will not justify the introduction of polygraph evidence (see generally, *e.g.*, *Gard*, 158 Ill. 2d 191, 632 N.E.2d 1026), absent an allegation that the statement was improperly obtained (see *Jefferson*, 184 Ill. 2d at 496, 705 N.E.2d at 61).

Nevertheless, we hold that such error was harmless under the circumstances of this case for two reasons. First, on cross-examination, subsequent to the introduction of the polygraph evidence, Williford did make a charge of coercion. After the polygraph evidence came in, Williford said he made the confession "for his safety." Williford testified that he was experiencing extreme heroin withdrawal when he gave the statement, and the police falsely told him he could go if he said that the defendant committed the murder. The polygraph evidence rebutted this claim by suggesting that Williford changed his story and confessed because the polygraph had shown that his original account was false.

In *People v. Jefferson*, the defendant also argued that the prosecution, by referring to the defendant's meeting with someone described as a "technician" (in fact, the person who operated the polygraph), brought in the polygraph examination before the defendant made any allegations of coercion. *Jefferson*, 184 Ill. 2d at 497, 705 N.E.2d at 62. The court held that the reference to a "technician" was sufficiently vague that it would not have alerted the jury that a polygraph examination was being discussed. "Moreover," the court continued, "as we have held above, the evidence became admissible once the defendant chose to challenge the circumstances that caused her to make the statement." *Jefferson*, 184 Ill. 2d at 497, 705 N.E.2d at 62.

An analogous situation occurred in *People v. Crockett*, 314 Ill. App. 3d 389, 731 N.E.2d 823 (2000), involving prior consistent statements rather than polygraph evidence. The prosecution elicited from one of its witnesses on direct examination that the witness had made earlier statements to the police consistent with her testimony at trial. The defense objected but the trial court overruled the objection. *Crockett*, 314 Ill. App. 3d at 406, 731 N.E.2d at 836. The appellate court noted that although prior consistent statements are generally not admissible, they may be admitted " 'to rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication.' " *Crockett*, 314 Ill. App. 3d at 407, 731 N.E.2d at 837, quoting *People v. Tayborn*, 254 Ill. App. 3d 381, 390-91, 627 N.E.2d 8, 15 (1993). Although evidence of a recent motive to fabricate had not been introduced when the prior consistent statement came in, such evidence was introduced later on cross-examination. The appellate court held:

"Introducing evidence of a prior consistent statement on direct ex-

amination in anticipation of evidence of a recent motive to fabricate *** is an improper way to proceed, because if the anticipated testimony were not forthcoming on cross-examination it would leave the jury with unwarranted evidence of prior consistent statements. The State should therefore have waited to introduce the prior consistent statements on redirect examination." *Crockett*, 314 Ill. App. 3d at 408, 731 N.E.2d at 838.

Nevertheless, the court held this to be a "mere technical error" since evidence of a recent motive to fabricate did come out on cross-examination and, accordingly, the prior consistent statements could properly have been introduced on redirect had they not been introduced on direct. *Crockett*, 314 Ill. App. 3d at 408, 731 N.E.2d at 838.

Similarly in this case, while it was improper for the State to introduce the polygraph evidence on direct examination, the error was harmless because it would have been permissible for the State to introduce the evidence on redirect in any case.

Further, this was a bench trial. In a bench trial if the court has admitted evidence for a limited purpose the court is presumed to only have considered it for that purpose. *People v. Avery*, 227 Ill. App. 3d 382, 392, 592 N.E.2d 29, 36 (1991). Here, the judge said that she would consider the evidence only for elucidation of the course of conduct leading up to the confession and not for the substantive results of the test. While it is clear that, absent an allegation that the statement was involuntary, the court should not have considered polygraph evidence even for the course of conduct, the main danger of prejudice to the defendant would have been in the judge considering the actual results of the examination as probative. The judge said that she would not so consider them.

## II. Sentencing Issues

### A

■ The defendant next contends that the trial court erred in admitting evidence concerning the path of a bullet. Detective Chernikovich testified on this subject but the defendant argues that the detective did not have sufficient qualifications to allow him to present opinions on ballistics matters. Detective Chernikovich testified that from the bullet hole in the shelf one could tell that the gunman was in the west side of the store. The defendant himself, as well as other witnesses, said that the defendant was the man in the west aisle. Based on this, the trial court concluded that the defendant, rather than Williford, was the shooter. The defendant concedes that, based on the law of accountability, it makes no difference as far as his conviction is concerned

whether he or Williford was the shooter. However, the conclusion that the defendant was the one who fired the gun appears to have been a consideration in the court's sentence. Accordingly, the defendant argues, we should vacate his sentence and remand for a new hearing.

The defendant objected to the admission of the picture of the bullet hole in the shelf, but the trial judge admitted it, reasoning that she did not need expert testimony in order to deduce the direction of the bullet from the photograph. The defendant argues that this type of matter is beyond the ken of the average trier of fact. We need not decide whether it was permissible for the finder of fact to make such an inference in the absence of expert testimony, however, for we hold that Detective Chernikovich's testimony was in fact admissible.

On direct examination Detective Chernikovich testified, making reference to the picture:

> "Examination of that particular bullet hole would indicate that the bullet traveled in that direction, entered into the top of the wooden display case and exited the top east side of this display case, actually blew out the segments of wood, a blow out effect."

Having examined the picture, we believe it is fairly clear which hole in the shelf is the exit hole. In our view, extensive training in ballistics was not necessary in order to determine that the hole in the shelf from which the wood fragments were forced outward or "blown out" was the exit hole. This "does not stretch the theoretical boundaries of science." *People v. Smith*, 261 Ill. App. 3d 117, 122, 633 N.E.2d 69, 73 (1994). Generally, "the degree and manner of knowledge and experience required of an alleged expert is directly related to the complexity of the subject matter and the corresponding likelihood of error by one insufficiently familiar therewith." *People v. Park*, 72 Ill. 2d 203, 209-10, 380 N.E.2d 795, 798 (1978). We find Detective Chernikovich to be qualified to offer such limited testimony. *Smith*, 261 Ill. App. 3d at 123, 633 N.E.2d at 73.

## B

■ The defendant also argues that his sentence must be reversed because the sentencing judge considered more than one victim impact statement from the victim's family. According to the defendant, consideration of more than one such statement is reversible error under the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq.* (West 1996)). This court already considered and rejected this argument in *People v. Benford*, 295 Ill. App. 3d 695, 700, 692 N.E.2d 1285, 1289 (1998).

## C

■ Finally, the defendant argues that his sentence must be vacated

because the trial court abused its discretion in refusing to allow him a continuance to bring in mitigation witnesses. We disagree.

On June 8, 1999, the trial court granted the defendant a three-day continuance over the State's objection and warned him that the court would not grant another. On June 11, defense counsel explained that members of the defendant's family were supposed to testify but were at the graduation ceremony of the defendant's daughter. The trial court denied the defendant's motion for a second continuance to allow the family members to appear. The court reminded defense counsel of its admonition that the case had been continued for the last time and of its offer to sign any orders needed to assist the defense in bringing in witnesses.

The defendant has waived this issue because he did not include it in a postsentencing motion. *People v. Reed*, 177 Ill. 2d 389, 686 N.E.2d 584 (1997). Even were we to proceed to the merits of this issue, we would not be inclined to reverse the circuit court. Whether to grant a continuance in order to secure witnesses is a decision within the sound discretion of the trial court. *People v. Scales*, 307 Ill. App. 3d 356, 358, 718 N.E.2d 281, 283 (1999).

In this case, the defendant did not make an offer of proof as to the testimony of the family members.

> "It is vital that attorneys for defendants make a statement as to what, if anything, would be presented in mitigation so as to give the trial court the opportunity of determining whether or not a continuance should be granted. In such a case, the trial judge could determine why a continuance was necessary. Without such statement it could not be said that the action of the trial court in refusing the request for continuance was reversible error." *People v. Hicks*, 125 Ill. App. 2d 48, 57-58, 259 N.E.2d 846, 850-51 (1970).

The trial court's awareness of the general subject of the proposed witness' testimony is not sufficient. *Scales*, 307 Ill. App. 3d at 359, 718 N.E.2d at 284. In the absence of an offer of proof we have no basis to say that the judge's decision was an abuse of discretion.

For the foregoing reasons, the judgment and sentence of the circuit court are affirmed.

Affirmed.

McNULTY, P.J., and O'MARA FROSSARD, J., concur.