THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE J. BALLE, Defendant-Appellant.

First District (6th Division)    No. 1—89—3191

Opinion filed November 29, 1993.

Llwellyn L. Greene-Thapedi, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara Jones, and Carolyn A. Reynolds, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury found the defendant, Willie J. Balle, guilty of aggravated criminal sexual assault and robbery. He was sentenced to natural life as an habitual criminal. He first contends that the evidence failed to establish his guilt beyond a reasonable doubt.

R.H., who was 21 years old at the time of trial, testified that she lived with her three children (ages 5, 2 and 10 months) and her mother and sister at 139 North Pine Street in Chicago. On the afternoon of December 12, 1987, at approximately 4:20 p.m., she left her home to purchase some Christmas tree ornaments. As she was crossing Fulton Street, a man she later identified as the defendant grabbed her from behind on her left side. She felt something sharp. She could see his face. The man put his hands "very tight" around her neck and said, "Don't say a word. I will kill you." He then put his arm around her shoulder and asked her to walk with him. The man was wearing a green army jacket, blue jeans, long underwear and black shoes.

She walked east on Fulton for about three-fourths of a block and came upon an alley. The defendant walked directly behind her and chose the direction that they walked. The defendant was walking behind R.H., about six to eight inches away. They went in the doorway of a vacant building. The defendant asked R.H. if she had anything in her pockets. She handed over $70 (three twenty-dollar bills and a ten-dollar bill). The defendant placed the money in his pocket. He then asked her to perform fellatio and to take off all her clothes. He unzipped his pants and exposed his penis. R.H. took off her clothes except her socks and performed fellatio. She was crying, and the defendant told her, "Shut up or I will kill you." Two or three minutes later the defendant told her, "You are not doing it right." He pulled her by her collar bone toward his face and told her to shut up.

R.H again performed fellatio for two to three minutes while she was squatting. The defendant instructed her to turn around and bend over; he then put his penis in her vagina. After two or three minutes, the defendant told her to get dressed. After she had dressed, the defendant told her to undress again and perform fellatio. After two to three minutes, the defendant told her, "Get dressed, we are leaving."

They left the building and came around to the front of a building on Lotus Avenue. The defendant had his hand across R.H.'s shoulder, clutching her neck. He instructed her to hold her head down as they walked. They walked to the rear of the same building that they had previously been in and went to a second-floor vacant furnished

apartment. The defendant told R.H. to take off her clothes and she complied, keeping her socks on. The defendant told her to perform fellatio, and she began to cry. The defendant hit her on the left side of her jaw with his fist. She stopped crying and performed fellatio. After two minutes, the defendant said, "That feels good," and told R.H. to kneel on the couch. After she did, the defendant put his penis into her vagina and ejaculated. The defendant told her to get dressed, and they left the building; he again walked right behind her. When they reached outside, the defendant put his arm around her shoulder, clutching her neck. The defendant told her to hold her head down and that they were going to a friend's house.

The defendant and R.H. walked north on Lotus, then on Lake Street to a liquor store. They did not enter the store because the defendant said it was too crowded. On Lake Street, R.H. saw a razor blade fall out of the defendant's pocket. She could not recall whether the defendant picked up the razor blade. They proceeded to another liquor store on Cicero Avenue. The defendant removed his arm from R.H.'s shoulder after they entered the store. The defendant purchased some wine. R.H. and the defendant were not separated while they were in the store. She could not see any other customers while in the store. After purchasing the wine, the defendant placed his arm on R.H.'s shoulder and together they walked south on Kilpatrick Street. The defendant drank some of the wine and forced R.H. to drink the rest. After finishing the wine, the defendant directed R.H., with his hand on her shoulder, half-way down an alley into someone's backyard, down a gangway and into a doorway.

Inside the doorway, the defendant unzipped his pants and told R.H. to perform fellatio. After a couple of minutes, he told R.H. to pull her pants down and bend over. R.H. complied and the defendant kissed her vagina and then put his penis into her vagina. After a few minutes, they left and walked to another liquor store; the defendant again kept his hand on R.H.'s shoulder. Inside the liquor store, located at the corner of Kilpatrick and Madison, the defendant gave R.H. some money and told her to purchase some gin. The defendant went outside to urinate.

There were about three customers and two workers in the store. R.H. began to cry and told the customer in front of her that she had been raped. The customer looked at her and told the Arab man behind the counter. The two men looked at R.H.; they appeared shocked. The defendant then walked into the store, approached R.H.'s side, and asked her if she had purchased the gin. R.H. purchased a half pint of gin with the money that the defendant gave her. The defendant also bought a can of beer. R.H. did not see a telephone in the

liquor store. As they left, the defendant put his arm over R.H.'s shoulder and around her neck in the same manner that he previously had when they walked together. The defendant led R.H. down an alley on Kilpatrick Street.

In the alley, the defendant asked R.H. to perform fellatio, and she began to cry. The defendant picked up an 18-inch wooden stick and said, "Shut up or I will kill you." R.H. then performed fellatio for about one or two minutes. The defendant drank from the bottle of gin. The defendant told her to get up and they went to another alley on Fulton. The defendant had his arm around her shoulder and once in the alley, the defendant asked R.H. to perform fellatio. After about two minutes, the defendant told her that "it felt good." Eventually, the defendant got up and zipped his pants. The defendant then fell over and passed out.

R.H. ran out of the alley, down Fulton Street to a house and rang the doorbell. She had never been at this house before and did not know who lived there. A woman, later identified as Venus Sawyer, answered the door. R.H. fell to the floor, cried, and told Ms. Sawyer that she had been raped. Ms. Sawyer told R.H. to come in, and then Ms. Sawyer called the police.

Two uniformed police officers came to the house and R.H. told them what had happened. She left with the officers to look for the defendant in the alley. The officers found the defendant asleep in the alley and took him back to the squad car. The officers then drove her to Loretto Hospital, where she was examined; swabbed specimens where taken from her mouth and vagina.

On cross-examination, R.H. testified that the defendant gave her three dollar bills to pay for the gin. The defendant did not display a gun or razor blade to her. The defendant did not have his arm around her in the liquor store. She passed people on the street as they walked down Fulton Street and on Cicero Avenue. She also stated that the defendant told her four different times that he would kill her. She thought that the threats were serious.

Venus Sawyer lived at 4718 Fulton Street. She testified that at 8 p.m. on December 12, 1987, R.H., whom she had never met, rang the doorbell. R.H. was screaming and crying and had lipstick smeared on her face. She smelled of wine. Once inside, R.H. fell to her knees and screamed that she had been raped. Ms. Sawyer sat R.H. down in a chair and tried to calm her. Ms. Sawyer called the police.

Chicago police officer Gibbons testified that he and his partner, Officer Males, monitored a rape victim call at 4718 West Fulton. He saw R.H. sitting at the kitchen table and she appeared very upset; her clothes were "messed up" and she was crying. R.H. told him that

the offender was probably still in the area. Officer Gibbons left the house and met Officer Johnson outside; Gibbons relayed the information to Johnson, who was assigned to the case. R.H. also gave Gibbons a description of the defendant's clothing: a white hat, green army jacket, and blue jeans. R.H. accompanied Johnson in his car to search for the defendant. She remained in the car while Johnson went into the alley. Johnson found the defendant behind some garbage bags; Johnson woke the defendant, who was asleep. Johnson brought the defendant over to the car where R.H. had remained. Immediately, R.H. became extremely upset, hysterical and screamed, "That's the guy. That's the guy."

Gibbons testified that on that night the defendant "was very dirty, smelled somewhat of alcohol. *** [H]e appeared to have urinated in [his pants]. His pants were open at the front. The zipper was undone." The defendant was wearing a green army jacket and no shirt. In place of the shirt was a blue windbreaker jacket and a beach bum, roll-up, white hat. The police searched the defendant and found a bottle of Seagram's Extra Dry gin and $65.

Pamela Fish, a criminalist for the Chicago Police Department Crime Detection Laboratory, testified that she examined blood samples from R.H. and the defendant, and saliva samples and sperm samples recovered from R.H. Ms. Fish concluded that R.H. was a type A secretor and that the defendant was a type B secretor. Sperm was present in R.H.'s vagina but not in her mouth. The sperm was from a type B secretor, which would be consistent with the defendant "contributing spermatozoa" to the sperm recovered from R.H.'s vagina.

Tysheer Axmad was called as a defense witness. He was the manager of Ranch Food and Liquor located at 4657 West Madison. At approximately 7:30 p.m. on December 12, a man and woman came into the store, and the woman asked Axmad for help. The woman approached the counter and asked for help in a quiet manner. He thought that she was afraid; she was crying; and he knew that she was in trouble. However, he could not understand what she was saying. He did not remember any conversation, but only remembered that she asked him to call the police. He showed her the phone that was near the entrance to the store. She bought a half pint of Seagram's gin and the man bought a can of beer. After they left the store, Axmad saw from the window the man holding R.H. He could not remember if R.H. told him that she had been raped.

Carol Bristow, also called by the defendant, was the nurse on duty at the emergency room of Loretto Hospital. She testified that she interviewed R.H. R.H. told her that she was grabbed at 14th and

Long Street and was sexually assaulted twice in the alley near Lake Street.

■ The defendant contends that the evidence was insufficient to support his conviction because R.H.'s testimony was "highly improbable." We concede that her testimony established an unusual set of facts, but we do not agree that the evidence taken as a whole was insufficient to establish guilt beyond a reasonable doubt. Her testimony was corroborated by Sawyer, the police officers, Axmad and the medical evidence. We cannot say that no rational trier of fact could have found that the State had established the essential elements of aggravated criminal sexual assault and robbery.

■ The defendant next contends that error occurred because the trial judge failed to instruct the jury on the lesser-included offense of theft or to give verdict forms for theft and the lesser-included offense of criminal sexual assault. This precise claim of error was raised and rejected in *People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743. In *Palmer* the appellate court found that where no instruction on a lesser-included offense was offered by the defendant, the trial judge did not have a duty to raise the issue *sua sponte*. We adhere to the holding of *Palmer*.

■ The defendant also contends that comments made by the prosecutor during opening statement and closing argument constituted prejudicial error. He specifically contends that the prosecutor made three allegations in the opening statement which were not supported later by the evidence. We do not agree. The prosecutor told the jury in opening statement that R.H. "felt something hard in her back." In her direct testimony, R.H. stated, "I felt something sharp in my back." The difference between "sharp" and "hard" is of no significance. The evidence clearly supported the prosecutor's opening statement that the defendant "took the money from her." The jury could also infer that it was the defendant rather than R.H. who actually "bought a half pint of gin" as the prosecutor said in his opening statement. The prosecutor's remark in opening statement that he represented the people of the State of Illinois and victims of crime was not improper.

The defendant contends that prejudicial error occurred in the prosecutor's closing argument in the following two instances:

> "Nobody is going to tell you [R.H.] is required by the law somehow to sit there and try and resist and maybe killed and make orphans out of her three children, she doesn't have to do that.

\* \* \*

Ladies and Gentlemen, as much as this man and his attorney

want to forget the name of this case its the People of the State of Illinois v. Willie Balle. [R.H.] is not on trial here even though she was attacked again today just like she was attacked on December 12, 1987."

In view of the defense attempt to denigrate R.H.'s failure to resist, we do not believe it is unfair argument to say that a single mother would not resist for fear of losing her life and thus leave her children without any parent. The jury was already aware that R.H. was the mother of three small children. The defendant's attorney later referred in his argument to the fact that she had three children.

The second remark of the prosecutor of which the defendant now complains could be considered a proper response to the argument of the defendant's attorney in which he said the following:

"[T]heir case rests solely on the testimony of the victim, a victim that is sorely suspect and has her credibility severely undermined. The case comes down to whether you believe her or you don't believe her.

* * *

*** [O]r just does her whole story and do we kind of feel or perceive or sense that there was something else going on this day between these two? And I submit to you that is what happened. *** Ladies and gentlemen, the picture is coming a little bit clearer, I hope in your mind that these two were partying that day, they had some money, they were big-timing, they had a little sex, they are moving around, they are getting a little liquor waiting for something to happen.

* * *

When you looked at [R.H.] you consider this, those of you who are women, mothers, husbands, fathers, did she appear to you to be the outraged victim of a sexual assault? Did it appear to you that she was the type of person that was brutally taken from place to place and her virtue taken along with it as she moved along? *** *[T]his is a mother of three children.* She is 21 years of age, she is *no shrinking violet*, and on the afternoon that she went out, according to her story, to get Christmas decorations and somehow ended up over here on Lotus and Long, which wasn't on the way *** she wasn't looking to be raped but I submit to you that she was looking for a little action and that is what she found." (Emphasis added.)

No one could deny that that argument was indeed an "attack" on R.H. We concede it was not "just like the attack" the defendant made on her; nonetheless, the State's argument was a reasonable response to the defendant's argument. We find no reversible error in the State's opening statement or closing argument.

■ The defendant next argues that he received ineffective assistance because his attorney failed to tender theft instructions and jury verdict forms for theft and criminal sexual assault. The decision to offer an instruction on a lesser-included offense is one of trial strategy, which has no bearing on the competency of counsel. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743.) Whether to tender an instruction on a lesser-included offense is almost always a question of trial strategy. In this case, the defendant's strategy at trial was that the sexual encounter was consensual and that there was no robbery or theft. The defendant's attorney may have hoped, based on his theory, that the jury would return not guilty verdicts on both charges and that the defendant thereby would avoid a compromised verdict. (*People v. Webster* (1988), 175 Ill. App. 3d 119, 529 N.E.2d 741 (defense counsel's decision not to offer lesser-included offense instruction for criminal sexual assault was matter of trial strategy to avoid a compromised verdict).) Although the strategy may have been unsuccessful, the defendant's attorney's representation did not fall below an objective standard of reasonableness. *People v. Shestiuk* (1978), 59 Ill. App. 3d 296, 376 N.E.2d 56 (mistake in trial strategy does not render defense counsel's representation incompetent).

We do not agree with the defendant's claim that his attorney made a "direct unequivocal concession of defendant's guilt." His attorney admitted only that sexual penetration occurred. He based his entire defense on an attempt to convince the jury that no force was present because the encounter was consensual. We cannot conceive what other defense could have been reasonably presented.

Because we find that no error occurred during the opening statement, the State's closing argument and R.H.'s direct testimony, we must reject the defendant's contention that his attorney was ineffective for failing to object during the opening statement, the closing argument and R.H.'s direct testimony. Similarly, we must reject the defendant's claim that his counsel was ineffective during cross-examination of Ms. Fish, who testified about the percentage of the population who were type B secretors. The defense admitted the defendant had sexual relations with R.H. Fish's testimony helped establish only that which the defense conceded.

For these reasons, we judge that the defendant was proved guilty beyond a reasonable doubt and that no prejudicial error occurred in the trial.

The judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and GIANNIS, J., concur.