NO. 4-05-0155          Filed: 12/15/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Macon County |
| TERRY G. EVANS, | ) | No. 02CF1105 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Timothy J. Steadman, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the opinion of the court:

In a December 2004 jury trial, defendant, Terry G. Evans, was convicted of first-degree murder for killing Carla Casey. At trial, each side put forth different theories on the manner of Casey's death and whether defendant was responsible. Two important facts were undisputed at trial: (1) according to the autopsy report, Casey died from blunt-force trauma to the brain, and (2) Casey fell from defendant's moving pickup truck. The State alleged defendant stamped Casey to death after she was dragged by his truck. Defendant claimed the victim was dragged and then accidentally run over by the truck causing her death. The jury accepted the State's theory and returned a guilty verdict. After considering the evidence, relevant factors in mitigation and aggravation, and the parties' recommendations, the court sentenced defendant to 35 years in prison.

Defendant appeals, claiming (1) the trial court erred in admitting the State's expert witness's testimony concerning his bloodstain-pattern analysis, (2) the State failed to prove defendant guilty beyond a reasonable doubt, (3) the trial court erred in refusing to instruct the jury on aggravated reckless homicide, (4) the trial court erred in denying defendant a new trial based upon newly discovered evidence, and (4) his trial counsel was ineffective for failing to tender lesser-included-offense instructions. We affirm.

I. BACKGROUND

On September 18, 2002, defendant was charged with three counts of first-degree murder for killing Casey on September 8, 2002, by inflicting broad-surface, blunt-force trauma on her (1) causing her death, (2)

knowing the act would cause her death, or (3) knowing the act created a strong probability of death or great bodily harm to her.

Defendant's jury trial continued over the course of five days, beginning on December 14, 2004. We summarize only testimony that is relevant to our disposition. On September 8, 2002, before 7 a.m., a man on his way to work discovered Casey lying in a gravel driveway approximately 15 feet from a white concrete-block commercial building. She was naked from her waist down and moaning. She later died at the hospital. Police found a significant pool of blood in the grass and a large bloodstain at the base of the building near where Casey was found. There was a small amount of blood, which appeared to be handprints or wiping marks, above the large stain on the wall.

Dr. Travis Lee Hindman, a forensic pathologist, testified that on September 9, 2002, he performed an autopsy on Casey. Dr. Hindman found a large amount of blood underneath her scalp. There was a large amount of "tearing loose or avulsion of the scalp from the surface of the skull." This injury would have been caused by a broad-surface blunt trauma associated with sliding of the skin. Casey had two hemorrhages underneath the eyelids of both eyes. She had a reddening of the skin indicative of broad-surface trauma on the right side of her face. Casey also had several cuts on her face produced by a relatively sharp object. She had a "slight pattern" on her right cheek extending down to her chin.

Dr. Hindman testified that Casey had skin redness on the left side of her face and below her lip. Casey had a large amount of debris in her hair, such as leaves, dirt, and concrete powder. Dr. Hindman described the bruising on Casey's torso and shoulders. Casey also had a number of small contusions on the right side of her leg. She had a "massive laceration" produced by crushing or tearing of the skin at the fold of the elbow on the front side. She had bruises on the back of her hand. Casey had several areas of "large brush burn" or road rash on her left hip, right hip, and left outer thigh. These areas of injury appeared to be made from a sliding motion. Casey also had a linear bruise extending across her lower back. Extending from her left knee and below, Casey suffered from an additional "broad surface application of blunt force." Dr. Hindman, however, did not see any indication of a sliding component to that injury.

Dr. Hindman testified that a number of Casey's upper teeth were partially dislocated with the front teeth broken out. Dr. Hindman ordered an X-ray that revealed her left hip was dislocated. Casey had also suffered severe trauma to her head caused by broad-surface blunt impact. She had fractures of ribs on both sides of her chest. She had fractured and dislocated vertebrae. Dr. Hindman testified that the injuries to her head and face were consistent with being kicked by a shoe. Most of the right shoulder strap of Casey's brassiere was missing.

Dr. Hindman testified that toxicology tests revealed a presence of alcohol in Casey's system (.04%), a trace amount of cocaine, and a metabolite of cocaine and alcohol. Cocaine was found in both sides of Casey's nasal cavity. Based upon a reasonable degree of medical certainty, Dr. Hindman opined that Casey died from "trauma of the brain due to blunt[-] force trauma to the head." Also contributing to the cause of death was the magnitude of the fracture dislocation of her vertebral column.

On cross-examination, Dr. Hindman testified that the broad-surface impact below the knee caused the dislocation of the hip. He testified that the hemorrhages in the eyelids were most likely caused by trauma to the head, rather than to the face. He said the incised marks above Casey's eye were caused by a sharp object like metal, plastic, or glass. Casey's left ear was torn where it had been pierced. Dr. Hindman said the brush burn areas also had a pattern-type injury. Defendant's counsel asked Dr. Hindman if the pattern-type injuries could have been caused by a tire going over the area. Dr. Hindman said the pattern was atypical of any tire pattern he had ever seen.

According to other witnesses at trial, defendant and his wife (Frieda Evans) went out drinking on September 7, 2002, with defendant's sister (Sherry Powell), Sherry's ex-boyfriend (Clint Clark), and a man known only as Juan. They patronized several taverns until the taverns closed at 2:30 a.m. Frieda had left the group several minutes earlier because she and defendant had gotten into an argument. After making sure Frieda made it home safely, defendant continued drinking with the remaining three at Clark's house. As the group sat outside drinking, they saw a woman, later identified as Casey, walking down the street alone. Clark hollered at Casey and invited her to their party. Casey joined the group. According to Clark, Casey was "friendly and

everybody seemed to be getting along." Casey asked defendant for a ride. He obliged, and the two, along with Juan, left Clark's residence in defendant's truck reportedly to purchase drugs. All three returned 15 to 20 minutes later.

Sherry testified that when they returned, defendant asked if he could use her van to smoke the crack cocaine they had just purchased. Sherry refused, so defendant and Casey used defendant's truck. At approximately 4 a.m., Juan, Casey, and defendant left in defendant's truck. Sherry and Clark went to sleep.

On September 10, 2002, Clark and Sherry saw a picture of Casey on television. They then purchased a copy of the newspaper "to find out exactly what happened." They learned in the newspaper that Casey was dead. Clark and Sherry went to defendant's house to "see if he'[d] seen the paper" since he was the last person seen with Casey. Clark said defendant's hand was "bruised[,] like he had been in a fight or something." Sherry showed defendant the newspaper. After defendant read the newspaper, he told Clark he "didn't want to have nothing to do with it. He didn't know nothing about that." Defendant told Clark and Sherry that he had gotten into an altercation with "some guys" who had "came and drug [Casey] out, dragged her into a little truck or something and he got in a fight with one of the guys." He said the last time he saw Casey, she was with the man by the small pickup truck.

Michael Kyrouac, a crime-scene investigator with the Illinois State Police, testified about the evidence he found inside, outside, and on the underside of defendant's truck. He examined the truck on September 11, 2002. He found blood on the driver's side seat just inside the door, the driver's floor mat, the back of the front seat, inside of the rear window, and the passenger side of the front axle. Officer Kyrouac found what appeared to be "swipe marks" on several areas of the truck's undercarriage, or areas that appeared to have made contact with something. He did not find any evidence that a human body or anything else had passed under the rear portion of the vehicle, only the front.

David Carter, a crime-scene investigator field supervisor with the Illinois State Police, was voir dired as an expert in bloodstain-pattern analysis. Carter explained his discipline as the application of physics and mathematics to bloodstains in order to determine their source and origin. The prosecutor asked Carter if it was

new or novel within the scientific community to use physics or mathematics to analyze bloodstains. Carter said no. He said "[a]lmost all major law[-]enforcement agencies use bloodstain[-]pattern analysis." The practice has been around for at least 50 years and was "generally accepted in [the] relevant scientific community of criminalysis." He said he had been declared an expert in this field six times by judges in Illinois courts. Carter explained the type of training he had received, the extent of the continuing education courses he had attended on the discipline, and the number of periodicals and articles he had read educating himself.

After voir dire, the trial court heard arguments on defendant's motion in limine, seeking to exclude the testimony of Carter's bloodstain analysis. In ruling on the motion, the court found the discipline of bloodstain-pattern analysis by relying on the physical properties of blood and applying principles of physics and mathematics was "certainly not new and novel." As such, there was no need for a Frye hearing (see Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). Or, in the alternative, the discipline had gained general acceptance in the field of criminology to satisfy the Frye standard. The court denied defendant's motion and ruled Carter competent to testify as an expert witness.

Carter testified that he was presented material in this case in 2003, including photographs of Casey's autopsy and the concrete-block wall. Although Carter was not able to view the bloodstains at the scene, he was able to enlarge the photographs with his computer and conduct his analysis. In Carter's opinion, the pool of blood in the grass at the base of the concrete-block wall, and the heavy concentration of blood on the wall, was from a wound on Casey's head. Carter thought the cut on the victim's eye would have been sufficient to allow the amount of blood that appeared in the grass and on the wall. Toward the top of the stain on the wall, the pattern began to spread, indicating to Carter that Casey was struck at a 90-degree angle by at least three impacts of a downward-force motion, such as a stamp. The bloodstains that appeared some distance above the pooled stain indicated that human fingers (with blood on them) were moved down the wall. The stains were consistent with a suspect using his hands to balance himself against the wall as he stamped on the victim's head below.

Detective Frank Hubbard testified that he interviewed defendant on September 10, 2002, at the police

station. After being advised of his Miranda rights (see Miranda v. Arizona, 384 U.S. 436, 469, 16 L. Ed. 2d 694, 720-21, 86 S. Ct. 1602, 1625 (1966)), defendant said, "[T]his is a bunch of shit, I had nothing to do with it." Defendant continued to deny he was involved or that he had ever seen Casey before. He was then allowed to speak with Frieda. After that conversation, he agreed to give a statement. The videotaped statement was played for the jury. The State rested.

Defendant's first witness was Adam Senalik, an accident reconstructionist. Senalik testified that he had been given the police report, autopsy report, photographs of the accident site, and autopsy photographs. In August 2004, Senalik met with defendant in person and examined defendant's truck. After reviewing all of the relevant information and relying on principles of physics, Senalik was able to contemplate a scenario of the events as they transpired during the early morning hours of September 8, 2002.

First, because there was no damage to the front bumper, hood, or grill of the truck, Senalik concluded that Casey was not struck while standing, kneeling, or sitting. Second, due to the presence of road rash on Casey's body, Senalik was able to conclude that Casey's body "was moving relative to the road[]way." Based upon defendant's description of the events, it was apparent (and Casey's injuries so indicated) that Casey's left side was hitting the roadway as the truck proceeded. Third, Senalik was able to conclude that defendant was capable of leaning out the passenger door while at the same time reaching the brake pedal with his foot. Fourth, defendant had described that when he hit the brakes, the passenger door swung open and rebounded shut, causing the pouch in the passenger door to hit him in the head. This story was consistent with the damage done to the pouch based upon certain measurements of defendant's body and the truck.

Finally, Senalik opined that Casey was dragged along the roadway on her left side as defendant grabbed the waistband of her shorts and underwear that were around her lower legs. Casey was also leaning left, which would have caused her body to roll under the truck when the brakes were applied. He said all of the information that he reviewed tended to indicate that Casey was run over by a tire. The pattern mark on the right side of Casey's face was consistent with the same scenario--the pattern was caused by a tire. Senalik opined that the physical evidence was consistent with defendant's version of the events.

On cross-examination, Senalik admitted that if defendant had not actually applied the brakes on the pickup truck as he described to Senalik, but not to the police in August 2004, the events could not have happened as Senalik had just described.

The parties stipulated that the "crescent[-]shaped pattern impression on the right face and neck area [of Casey] could not have been made by the Athletic Works brand shoes submitted; however, a pattern could have been made by a shoe. The patterns on the thigh and shin areas were of an irregular and confused nature and no scientifically valid conclusion could be made."

Defendant exercised his right to testify. He testified to the events of September 7 and 8, 2002, consistently with the other witnesses regarding their evening out. Defendant and Juan went to Clark's house when the bars closed and eventually Casey joined the group. Defendant said not long after Casey arrived, he and Juan gave Casey a ride to get some drugs. Defendant thought Casey was going to buy some "weed," but instead she bought crack cocaine. They drove back to Clark's, where Casey smoked the crack. At approximately 4 a.m., Casey and Juan left with defendant in his truck. Defendant took Juan home first, then drove Casey to a couple of different stops. At one place, she exited the truck, took just a few steps, and "darted" back in. Defendant did not know what she was doing. Defendant opened his wallet and gave Casey $10. He said his wallet was chained to his belt loop. After he gave Casey the $10, he laid the wallet on his leg. Defendant said Casey "kept wanting to blare" his stereo, and he repeatedly told her to stop.

Defendant testified that the next thing that happened, Casey turned to face him and put her foot on his on the accelerator. He looked over to Casey and she stabbed his hand with an unknown object. She stabbed him again as she tried to grab his wallet. He tried to knock the weapon out of her hand, but missed twice, though he did hit her in the face. She had removed her foot from the accelerator. Defendant said Casey then "ben[t] over and grabbed my wallet and trie[d] to exit the truck." He said it "didn't look like she tried to jump or nothing like that; it looked like she had slipped." Defendant tried "to grab her before she got away with [his] wallet." He grabbed her shorts "to keep her from going completely out of the vehicle." Defendant was lying across the front seat. He was not steering the truck because he could not reach the steering wheel. Casey's

- 7 -

"clothing almost came straight off." He could feel vibrations as he hung onto her. He said he tried to hit the brakes, but he missed. He tried again, hit the pedal, "and as soon as [he] hit it, it just slammed [him] into the floorboard." He lost his grip on Casey. When defendant hit the brakes, the passenger door swung shut and hit him in the head and arm. He damaged the storage pouch in the passenger door. Defendant said he felt the rear of his truck hit a big speed bump.

Defendant said he turned the truck around to find Casey. He saw her lying in the gravel in the road. She was moaning. Defendant said he "knew [he] had to get her out of the road before somebody came by and seen. So, [he] pulled on her and pulled her over by the building which was pretty close." Defendant did not notice if Casey still had her clothes and shoes on. He placed Casey's body up against the wall. Defendant reached down toward Casey "to see how bad she was hurt," and she started shaking her head back and forth. When he reached down toward her, he got blood all over his hands. He punched the wall because he was angry at himself, wiped the blood from his hands on the wall, jumped in his truck, and took off. When he left, he thought Casey would survive. Before defendant arrived home, he realized Casey's purse was still in the truck. He thought he would make it "look like a robbery went bad." He threw her purse out as he drove.

On September 10, 2002, defendant spoke with the police. He said he lied to them originally because he was scared. He changed his mind after he spoke with Frieda at the police station. Defendant denied stamping on Casey, intentionally running over her, or possessing any ill feelings toward her.

On cross-examination, defendant said he lied to everyone he spoke to between September 8, 2002, and September 10, 2002. The prosecutor asked defendant where he worked in September 2002. Defendant said he worked for himself as a subcontractor. He did a lot of painting and yard work. The prosecutor asked defendant what shoes he wore when he worked in people's yards and painted their houses. Defendant said, "Probably them," pointing to the boot-type tennis shoes marked as an exhibit. The prosecutor asked defendant to locate the grass stains on the shoes. Defendant said he did not know. The prosecutor asked defendant to locate the paint smears or drops on the shoes. Defendant again said he did not know.

Defendant said he could not explain (1) how Casey's bloodied bra strap ended up 26 feet west of the

main blood spatter, (2) how the $10 bill ended up 18 feet west of the main blood spatter, (3) how her underwear ended up 10 feet west of the main blood spatter, (4) how her shorts ended up 4 feet from the main blood spatter, or (5) how a bloody sanitary napkin ended up 18 feet from the main blood spatter.

The prosecutor asked defendant if he had placed Casey's shoes side by side facing in the opposite direction. He said he had no recollection of doing it, if he did. The prosecutor asked defendant to describe the damage, dirt, grime, and scuff marks on the shoes. He said he saw dirt but not much else. Defendant admitted the shoelaces looked "fairly" clean. Neither shoe had any damage to the outside, and the soles looked clean. Defendant said he could not explain how three separate earrings ended up in the bloody pool of grass.

Defendant said he had told Senalik certain details (like how he hit the brake pedal as he laid in the seat while clinging to Casey or that he had been stabbed in the hand twice) that he did not tell the police in the videotaped interview because, by the time he spoke with Senalik, he had "had plenty of time to sit back and reflect."

Defendant said when he left Casey, she did not look that bad--"not bad enough that you would think somebody was going to die from whatever happened." He said her face was not covered in blood. The prosecutor asked defendant to explain why, if he had done nothing wrong, he did not try to help Casey. Defendant said: "Just scared. I don't know. Just scared." The prosecutor posed the following question: "All you were worried about is covering for you, but you had not done anything wrong, is that correct?" Defendant said, "Yes, sir."

On redirect examination, defendant said he had purchased the shoes marked as an exhibit only 1 1/2 months before he was arrested. He had not done any painting jobs in them. Defendant rested.

During deliberations, the jury sent a note to the judge posing the following question: "Would the act of concealment of a seriously injured person in itself be an example of an act that would create a strong probability of death or great bodily harm?" After conferring with the parties, the judge responded as follows: "You must not single out certain instructions and disregard others. Furthermore, you must consider each instruction in its entirety." The jury continued to deliberate and later the same day returned with its verdict,

finding defendant guilty of first-degree murder.

On January 12, 2005, defendant filed a motion for a new trial, alleging there was insufficient evidence of guilt, the trial court erred in failing to instruct the jury on the lesser-included offense of aggravated reckless homicide, and there existed newly discovered evidence corroborating defendant's claim of innocence. On February 2, 2005, the trial court denied defendant's motion for a new trial. The court sentenced defendant as stated. This appeal followed.

## II. ANALYSIS

### A. Admissibility of Bloodstain-Pattern Analysis Under Frye

At trial, the State called an expert witness, David Carter, to relay his findings after he had reconstructed the crime based upon the blood spatters found on the concrete-block wall. Defendant had filed a motion in limine, seeking to exclude Carter's testimony as unreliable. After the voir dire of Carter and the parties' respective arguments, the trial court denied defendant's motion and allowed Carter to testify as an expert in bloodstain analysis. Defendant claims on appeal that Carter's bloodstain-pattern-analysis testimony should not have been admitted into evidence at trial because the State failed to make the showings required by Frye.

Initially, we note that the State claims defendant has forfeited this issue because he failed to include the claim in his posttrial motion. Generally, the failure to raise an issue in a written motion for a new trial results in the forfeiture of that issue on appeal. People v. Enoch, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988). To preserve an issue on appeal, a defendant must object to the purported error at trial and include it in his written posttrial motion. Enoch, 122 Ill. 2d at 186, 522 N.E.2d at 1130.

Defendant acknowledges his procedural error but invites us to review the matter under the plain-error doctrine. Because we find the evidence was closely balanced and of great magnitude (i.e., the verdict was based primarily upon a credibility determination of the competing theories testified to by the parties' respective experts), we will decide the issue on the merits. See People v. Canulli, 341 Ill. App. 3d 361, 369, 792 N.E.2d 438, 443-44 (2003) (because the only evidence of defendant's guilt rested with scientific evidence, the trial

court's error in failing to conduct a Frye test may have denied defendant his right to a fair trial).

On the merits, in Frye, 293 F. at 1014, the federal court held that expert testimony based on a scientific procedure or test is admissible only if the procedure or test is "sufficiently established to have gained general acceptance in the particular field in which it belongs." Illinois courts still follow Frye, even in the wake of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), which held that the Federal Rules of Evidence supersede Frye. People v. Watson, 257 Ill. App. 3d 915, 924, 629 N.E.2d 634, 640-41 (1994). Frye applies only to novel scientific techniques. Daubert, 509 U.S. at 592 n.11, 125 L. Ed. 2d at 482 n.11, 113 S. Ct. at 2796 n.11. "A scientific technique is new or novel if it is "'original or striking'" or does "'not resembl[e] something formerly known or used.'"" People v. Cumbee, 366 Ill. App. 3d 476, 492, 851 N.E.2d 934, 946 (2006) (Second District), quoting Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63, 79, 767 N.E.2d 314, 325 (2002), quoting Webster's Third New International Dictionary 1546 (1993). We review de novo a trial court's Frye ruling. In re Commitment of Simons, 213 Ill. 2d 523, 531, 821 N.E.2d 1184, 1189 (2004).

Defendant urges this court to rely on our decision in People v. Owens, 155 Ill. App. 3d 990, 999-1000, 508 N.E.2d 1088, 1094-95 (1987), where we reversed the defendant's murder conviction, which had relied on an expert witness's testimony regarding blood-spatter analysis. This court reversed the conviction, not because we found the blood-spatter analysis principle was not generally accepted in the scientific community, but because of a foundation issue. Owens, 155 Ill. App. 3d at 999-1000, 508 N.E.2d at 1094-95. We found the State had presented insufficient evidence of the expert's qualifications, knowledge, training, or experience. Owens, 155 Ill. App. 3d at 998-99, 508 N.E.2d at 1094. We noted that the evidence "fell far short of that presented in Knox [People v. Knox, 121 Ill. App. 3d 579, 459 N.E.2d 1077 (1984) (Third District).], the sole Illinois case in which evidence of blood-spatter analysis has been held admissible." Owens, 155 Ill. App. 3d at 999, 508 N.E.2d at 1094.

Here, unlike in Owens, Carter testified extensively as to his training, the techniques he learned, and their application in the field. He testified that he had 170 hours of training in the field, had previously been

qualified as an expert in the field six times in other Illinois courts, and had 24 years' experience as a police officer with the last 6 years concentrating on forensics with a specialty in bloodstain-pattern analysis. Along with his classroom-type training, he named a number of periodicals and texts that he had read and relied upon in conducting his analyses. He had conducted numerous experiments with human blood, testing the theories of the field. He testified that he was a member of more than one bloodstain-pattern-analysis organization. As a member, he received updates in the field, academic literature, and continuing education.

Based upon his testimony, we find Carter was well-qualified as an expert in the field to testify as to his conclusions and that practice was generally accepted within the scientific and law-enforcement communities. The trial court did not err in denying defendant's motion in limine and admitting Carter's testimony at trial.

### B. Proof Beyond A Reasonable Doubt

Defendant next claims the State failed to prove him guilty beyond a reasonable doubt. Defendant's claim is based upon two specific grounds: (1) the State failed to establish an adequate foundation for Carter's testimony that defendant kicked or stamped Casey and (2) the evidence was insufficient to establish defendant was guilty of first-degree murder.

### 1. Carter's Testimony

As defendant does in his first argument, he argues that Carter's testimony was inadmissible based upon his lack of expertise in bloodstain-pattern analysis. The State claims defendant has forfeited this argument by not objecting to it in the trial court or by not including it in his posttrial motion. As we stated above, the evidence in this case was closely balanced, and thus, we choose to decide the issue on the merits. See People v. Heard, 187 Ill. 2d 36, 63, 718 N.E.2d 58, 73 (1999) ("Waiver, however, is not a limitation on this court's right to entertain an argument").

Incorporating our previous discussion, we reiterate that we find Carter's testimony was sufficient to establish his expertise, training, and experience in the field of bloodstain-pattern analysis. Carter testified extensively about the nature and principles of his area of study. He had learned the techniques of the field,

studied them, and applied them on numerous occasions.

Carter testified that based upon the appearance of the bloodstain and the accompanying spatter on the concrete-block wall, Casey must have been lying against the base of the wall when defendant stamped (with a downward force) on Casey's head and face at least three times. Carter opined that the finger smears in blood that appeared above the main stain were most likely created by defendant's fingers as he held onto the wall while stamping. These theories were based upon Carter's education and experience and education as an expert witness in the analysis of bloodstain patterns. Despite defendant's claims to the contrary, we find (1) the State produced an adequate foundation for Carter's qualifications and his opinions as an expert and (2) the trial court did not err in qualifying Carter as an expert and admitting his testimony. See Simons, 213 Ill. 2d at 530-31, 821 N.E.2d at 1189 ("The decision as to whether an expert scientific witness is qualified to testify in a subject area, and whether the proffered testimony is relevant in a particular case, remains in the sound discretion of the trial court").

## 2. Sufficiency of the Evidence

Defendant claims his conviction should be reversed because the State failed to prove he was guilty beyond a reasonable doubt. He claims the evidence presented against him did not support the jury's guilty verdict. We disagree.

"In reviewing the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) People v. Jordan, 218 Ill. 2d 255, 269, 843 N.E.2d 870, 879 (2006). The reviewing court must not retry defendant but be mindful that it was the jury who saw and heard the witnesses. People v. Cunningham, 212 Ill. 2d 274, 279-80, 818 N.E.2d 304, 308 (2004). "[T]he fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the [appellate] court." Cunningham, 212 Ill. 2d at 280, 818 N.E.2d at 308. Instead, our duty as a "reviewing court[] [is] to 'determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" (Emphasis in original.) Cunningham, 212 Ill. 2d at 279, 818 N.E.2d at 308, quoting

Jackson v. Virginia, 443 U.S. 307, 318, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979).

Carter's testimony supported the State's theory that defendant stamped or kicked Casey's head at least three times. Carter opined that, of the injuries that appeared on Casey's body, only a head wound would have produced the amount of blood that was found in the grass and on the wall. The blood spatter indicated that the force that caused the blood was applied at a medium velocity on a downward motion toward the source, consistent with a stamp or a kick. Dr. Hindman testified that Casey died from "trauma of the brain due to blunt[-]force trauma of the head." Dr. Hindman said he had considered the possibility that Casey had been kicked in the head and face based upon the pattern mark that had appeared on her right temple. Hindman thought the pattern on Casey's face was atypical of a tire mark. Although the parties stipulated that the pattern mark on Casey's face could not have been made by the shoes admitted into evidence, the testimony of Frieda and defendant regarding the number of shoes defendant owned at the time of the murder was called into question. Defendant's expert, on the other hand, testified that Casey's face and head were run over by the truck, which caused her death.

To find defendant guilty of first-degree murder, the jury must have found that defendant killed Casey with the intention of killing her, knowing that it was likely that his actions would cause her death, or that his acts created a strong probability of death or great bodily harm. The jury considered the evidence, including defendant's testimony, and judged the credibility of the witnesses. When viewing the evidence in the light most favorable to the prosecution, we find a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt.

### C. Aggravated Reckless Homicide Instruction

Defendant contends that he was entitled to a jury instruction on the offense of aggravated reckless homicide. Without deciding whether aggravated reckless homicide was a lesser-included offense of first-degree murder, the trial court refused to give the proposed instruction, holding that there were no indications that defendant had acted in a reckless manner. We agree.

Because like the trial court, we need not reach the issue of whether the charged offense encompasses

a lesser-included offense, our standard of review of the court's refusal to give the instruction is abuse of discretion. People v. Kidd, 295 Ill. App. 3d 160, 167, 692 N.E.2d 455, 460 (1998) ("Whether to issue a specific jury instruction is within the province of the trial court, and such a decision will not be reversed unless it is an abuse of discretion").

Our supreme court has stated:

"If there is evidence in the record that, if believed by the jury, would reduce a crime from murder to manslaughter, a defendant's request for a manslaughter instruction must be granted. [Citation.] Defendant has the burden of proving there is at least 'some evidence' of serious provocation or the trial court may deny the instruction. [Citation.] The evidence upon which defendant relies must rise above the level of a mere factual reference or witness' comment, for otherwise defendant could force the trial court to include unlimited instructions which are not related to the case." People v. Austin, 133 Ill. 2d 118, 124-25, 549 N.E.2d 331, 334 (1989).

Defendant's tendered instruction, which the trial court rejected, said: "A person commits the offense of aggravated reckless homicide when he unintentionally causes the death of an individual by recklessly driving a motor vehicle in a manner likely to cause death or great bodily harm while under the influence of alcohol or any other drug or drugs." There was evidence presented at trial that defendant had consumed alcohol and, possibly, cocaine on the night of the incident. However, there was no evidence presented that defendant "recklessly [drove] a motor vehicle in a manner likely to cause death or great bodily harm."

According to the State's theory of the case, defendant killed Casey by administering broad-surface, blunt-force trauma to her head by stamping her. According to defendant's theory of the case, Casey suffered broad-surface, blunt-force trauma to her head when her head was dragged along the pavement or when she was accidentally run over by the truck. Accepting either theory, the evidence did not reveal that defendant drove his truck in such a manner that caused Casey's death. Neither side proposed that defendant intentionally dragged Casey down the street.

In order for defendant's conduct to be reckless, he "must have consciously disregarded a substantial

- 15 -

and unjustifiable risk that the act would cause death or great bodily harm." (Emphasis in original.) People v. Castillo, 188 Ill. 2d 536, 541, 723 N.E.2d. 274, 277 (1999). There was no such evidence. Defendant testified that he momentarily lost control of the truck as he laid across the seat holding onto to Casey. Even this loss of control could not be described as one "disregard[ing] a substantial and unjustifiable risk" because at the time, he was trying to divert an even greater risk of death or great bodily harm. Defendant's conduct in driving the truck could not be described as reckless and, thus, could not support a jury instruction on aggravated reckless homicide.

### D. Newly Discovered Evidence

Defendant next claims that he should be granted a new trial because he learned after trial from Casey's ex-boyfriend, Jeffrey Milbrodt, that Casey had a habit of getting high on crack cocaine and jumping from moving vehicles. After considering the evidence, including Milbrodt's testimony, and arguments of counsel, the trial court found that, despite the inadmissibility of the witness's testimony, the newly discovered evidence would not have changed the outcome of the trial. The court said the testimony "was simply cumulative corroborative evidence of what the [d]efendant testified happened. A version which the jury rejected."

"For new evidence to warrant a new trial, the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material to the issue, not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier." People v. Orange, 195 Ill. 2d 437, 450-51, 749 N.E.2d 932, 940 (2001).

There is no question that this newly discovered evidence could not have been discovered earlier, irrespective of defendant's due diligence. However, the evidence, even if admissible, would not have changed the result of the trial and was not material to the ultimate issue. As pointed out above, the two sides proposed different theories on what occurred between defendant and Casey, what caused her death, and if defendant was responsible. Milbrodt's testimony would not have affected either theory. Defendant was not accused of pushing Casey out of the truck. If he had been so charged, Milbrodt's testimony could have corroborated

defendant's potential claim of actual innocence. However, the State theorized that Casey fell from the truck either as an accident or by her own doing--whichever way it actually occured did not matter. We find the trial court properly denied defendant's motion for a new trial based on newly discovered evidence.

## E. Ineffective Assistance of Counsel

Finally, defendant claims, in the alternative to his earlier argument, that his trial counsel was ineffective for failing to tender jury instructions for reckless homicide and involuntary manslaughter. Our earlier discussion, related to defendant's previous claim of error, belies defendant's claim that his conduct could have satisfied the elements of reckless homicide. We found no evidence to support the offense and thus no evidence to support giving the respective instruction. Defendant did not, under any circumstances, operate his vehicle in a reckless manner that caused or was likely to cause Casey's death. According to the evidence, defendant's conduct in relation to driving the truck was not reckless. Because defendant's operation of the vehicle was not reckless within the definition of reckless homicide, the trial court did not err in refusing to include a jury instruction on aggravated reckless homicide and counsel was not ineffective for failing to tender an instruction on reckless homicide.

The proposal of an instruction on involuntary manslaughter is a different matter. An involuntary-manslaughter instruction would effectively remove operation of the pickup truck from the mix. According to Illinois Pattern Jury Instruction, Criminal, No. 7.07, "[a] person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual [without lawful justification] by acts which are performed recklessly and are likely to cause death or great bodily harm to another." Illinois Pattern Jury Instructions, Criminal, No. 7.07 (4th ed. 2000). Defendant claims that his trial counsel was ineffective for failing to submit this instruction as an alternative for the jury.

To establish ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was deficient and that he was prejudiced by counsel's error. Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Counsel's performance is presumed to be the product of sound trial strategy and not of incompetence (Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694-95,

104 S. Ct. at 2065), and no Strickland violation will be found unless counsel's professional errors are so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment" (Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064). To satisfy the prejudice prong, a defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceedings would have been different. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Both prongs must be satisfied before a defendant can prevail on an ineffective-assistance-of-counsel claim. People v. Coleman, 183 Ill. 2d 366, 397-98, 701 N.E.2d 1063, 1079 (1998).

This court has repeatedly held that an adjudication of a claim for ineffective assistance of counsel is better made in proceedings on a petition for postconviction relief, where a complete record can be made. People v. Calvert, 326 Ill. App. 3d 414, 421, 760 N.E.2d 1024, 1030 (2001); People v. Holloman, 304 Ill. App. 3d 177, 186, 709 N.E.2d 969, 975 (1999); In re Carmody, 274 Ill. App. 3d 46, 56, 653 N.E.2d 977, 984 (1995); People v. Palacio, 240 Ill. App. 3d 1078, 1087, 607 N.E.2d 1375, 1380 (1993); People v. Flores, 231 Ill. App. 3d 813, 827-28, 596 N.E.2d 1204, 1213-14 (1992); People v. Kunze, 193 Ill. App. 3d 708, 725-26, 550 N.E.2d 284, 296 (1990). Our rationale centered around the absence of a useful record in considering the issue. In the above-cited cases, as in this case, the record contained nothing to review with respect to the reason for defense counsel's actions.

We are unable to determine why counsel did not submit a jury instruction on the lesser-included offense of involuntary manslaughter and whether that decision constituted a trial tactic or incompetence. Illinois courts have specifically held that "[t]he decision to offer an instruction on a lesser-included offense is one of trial strategy, which has no bearing on the competency of counsel." People v. Balle, 256 Ill. App. 3d 963, 971, 628 N.E.2d 509, 514 (1993); see also People v. McIntosh, 305 Ill. App. 3d 462, 471, 712 N.E.2d 893, 900 (1999); People v. Nunez, 319 Ill. App. 3d 652, 659, 745 N.E.2d 639, 646 (2001); People v. Dominguez, 331 Ill. App. 3d 1006, 1015, 773 N.E.2d 1167, 1174 (2002); People v. Benford, 349 Ill. App. 3d 721, 728, 812 N.E.2d 714, 720 (2004). "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." People v. Smith, 195 Ill. 2d 179, 188, 745 N.E.2d 1194, 1200 (2000).

Defendant's counsel may have intentionally not submitted the instruction hoping the jury would reject an "all-or-nothing approach." Counsel may have decided that it was better strategy to not give the jury a third option. Or, counsel may have failed to submit the instruction in error. We do not know and cannot speculate. "Because the answers to the questions pertinent to defendant's claim are currently <u>dehors</u> the record, we decline to consider them. Instead, defendant may pursue his claim under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 through 122-8 (West [2000]))." <u>Calvert</u>, 326 Ill. App. 3d at 421, 760 N.E.2d at 1030.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment. As part of our judgment, we grant the State its statutory assessment of $75 against defendant as costs of this appeal.

Affirmed.

KNECHT and TURNER, JJ., concur.